1
2
3
4
5
6

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

7
8
9

| | |
|---|---|
| RONALD JAMES BISHOP, | CV F   03-5830 DLB HC |
| Petitioner, | ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS AND DIRECTING CLERK OF COURT TO ENTER JUDGMENT IN FAVOR OF RESPONDENT |
| v. | |
| R.A. CASTRO, WARDEN, | [Doc. 1] |
| Respondent. | |

10
11
12
13
14
15

Petitioner is a state prisoner proceeding pro se with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254.  Pursuant to 28 U.S.C. § 636(c)(1), the parties have consented to the jurisdiction of the United States Magistrate Judge.

### PROCEDURAL BACKGROUND

After jury trial in the Mariposa County Superior Court, Petitioner was convicted of second degree burglary in violation of California Penal Code §450, and escape or attempted escape following arrest in violation of California Penal Code § 836.6(b), and admission of four prior strike convictions in violation of California Penal Code §§ 667(b)-(I), 1170.12.  On March 30, 2000, Petitioner was sentenced to a life term in state prison.

Petitioner filed a timely notice of appeal to the California Court of Appeal, Fifth Appellate District.  The Court of Appeal affirmed the judgment on April 29, 2002.  Petitioner filed a petition for review to the California Supreme Court, and the petition was denied.

Petitioner filed the instant federal petition for writ of habeas corpus on June 12, 2003,

16
17
18
19
20
21
22
23
24
25
26
27
28

1

1   raising the following claims: 1) Prosecutorial misconduct by (a) violating court order limiting

2   characterization of Countz's misdemeanor prior conviction; (b) requesting a witness comment on

3   the veracity of other witnesses; (c) eliciting Deputy Robles comments on the veracity of the

4   Petitioner; (2) Ineffective assistance of counsel for (a) failing to object to improper questions by

5   prosecutor; (b) failing to raise a hearsay objection to evidence of Countz misdemeanor

6   conviction; and (c) failing to adequately cross examine Deputy Robles; (3) Insufficient evidence;

7   (4) Sentence constitutes cruel and unusual punishment in violation of due process.

8          By order of July 21, 2003, the Court directed Respondent to file a response to the petition.

9   On September 19, 2003, Respondent filed a motion to dismiss.  Respondent argued that the

10  instant petition should be dismissed as a "mixed" petition containing both exhausted and

11  unexhausted claims.  On January 30, 2004, the Court issued an order to show cause why the

12  motion to dismiss should not be granted.  On February 25, 2004, Petitioner filed a return to the

13  order to show cause and requested that the unexhausted grounds, 2(c) concerning the adequacy of

14  the cross-examination of Deputy Robles, (3) insufficiency of evidence, and (4) Eighth

15  Amendment cruel and unusual punishment claim, be withdrawn from the action.  On March 5,

16  2004, the Court granted Petitioner's request to withdraw the unexhausted claims and ordered

17  Respondent to file an answer to the exhausted claims.

18         Respondent filed its answer on June 7, 2004, and Petitioner filed a traverse on July 8,

19  2004.

20         On July 28, 2005, the Court directed Respondent to submit supplemental briefing

21  regarding Petitioner's prosecutorial misconduct claim.  On August 12, 2005, Respondent filed a

22  supplemental brief letter.  Petitioner filed a supplemental traverse on October 7, 2005.

23                          STATEMENT OF FACTS[1]

24         Prosecution Evidence

25                Steve Countz lived at 4983 Mt. Bullion Cut-off Road, two houses away

26

27         [1] The Court finds the Court of Appeal correctly summarized the facts in its April 29, 2002, opinion.  Thus,
    the Court adopts the factual recitations set forth by the California Court of Appeal, Fifth Appellate District.  (Lodged
28  Documents.)

from [Petitioner], for about two years.  Countz's son, Jerry,[2] lived with Countz for a few weeks before moving in with [Petitioner] and [Petitioner's] girlfriend, Tina Peacock.  Tina would frequently ride Countz's horse.  Located on the property leased by Countz were approximately nine outbuildings in addition to the main residence, including a garage, carport, shed, greenhouse, and an enclosed chicken coop.  Countz did not have the owner's permission to use the garage or most of the other outbuildings.  The shed, which Countz was permitted to use, shares a common wall with the garage, and there is a doorway between the two structures.  Two two-by-four pieces of wood were attached to the doorway to block access to the garage; nevertheless, one could easily climb through the doorway.  The shed attached to the garage has two doors that were never locked.

At about 4:00 a.m. on September 3, 1999, Eddie Lopes heard noises coming from the property next to his home.  Lopes knew that Countz had moved out of that home a few days earlier, so Lopes called the sheriff's department.  Deputies McCann and Robles, who responded to Lopes's call, found that the residence appeared to be intact.  Upon searching the outbuildings, the deputies found [Petitioner] hiding inside the shed.  In searching [Petitioner], the deputies found electrical switch plates, screwdrivers, a small flashlight and other miscellaneous items in his pockets.

When asked his name, [Petitioner] identified himself to the deputies as "James Johnson."  [Petitioner] was advised of and waived his *Miranda*[3] rights.  He told the deputies that he entered the garage in search of a place to sleep.  [Petitioner] eventually stated that he knew the previous occupant and wanted to get some electrical supplies, but denied that he had permission to take the items.  He claimed that the flashlight he was carrying was his own but that the rest of the items were from the garage.  It appeared that [Petitioner] was attempting to remove a vanity and mirror from the garage.

Deputy McCann told [Petitioner] that he was under arrest and escorted him to McCann's patrol car.  When McCann reached to unlock the car door, [Petitioner] broke away from McCann, ran toward the road and shortly thereafter fell face first onto the pavement.

While Countz did own the chickens, shop light and pool table, he was not the owner of the items in the garage and did not have authority to give them away.  The mirrors, electrical materials and tools in the garage had been left by a

---

[2] Steve Countz will hereinafter be referred to as Countz.  His son, Jerry, will be referred to as Jerry.

[3] Miranda v. Arizona, 364 U.S. 436 (1996).

previous owner of the property and belonged to the current owner, Ruth Helzer. Helzer did not give anyone permission to take a vanity or mirror.

Defense Evidence

Jerry works as an electrician and helped [Petitioner] remodel a house on [Petitioner's] property. Jerry told [Petitioner] that there was a recessed light, a switch, and a box full of electrical parts at his father's house that [Petitioner] could have. Jerry had asked his father whether he planned to take the recessed light. Jerry figured that [Petitioner] could take it because Countz said he was not going to take it when he moved. The items found on [Petitioner] upon his arrest looked like the items that were in the box Jerry had offered to [Petitioner].

While [Petitioner] was showing Jerry some of the work that he wanted done on the cottage he was remodeling, he told Jerry that he wanted to install a medicine cabinet. [Petitioner] testified that Jerry told him that there were two or three medicine cabinets at his father's house from which [Petitioner] could choose one. Jerry could not recall whether he told [Petitioner] that he could take a medicine cabinet and mirror from his father's property. Tina, however, testified that she recalled hearing that conversation between [Petitioner] and Jerry.

Tina testified that she got up at approximately 3:00 or 3:30 a.m. on September 3, 1999, to prepare breakfast and [Petitioner's] lunch. [Petitioner] commuted to Modesto and needed to leave the house at approximately 6:00 a.m. While Tina cooked, [Petitioner] went outside to feed the animals. Tina asked [Petitioner] to get the chickens from Countz's house at that time, as it would be much easier to bag them while they were sleeping. She did not tell [Petitioner] exactly where the chickens and feed were located.

[Petitioner], carrying a flashlight and empty feed sacks, headed to where he believed the chickens were located. He passed the carport and remembered the can light that Jerry said he could have. [Petitioner] did not know Ruth Helzer and believed that Countz owned the property. [Petitioner] saw the can light, pool table, and electrical switches in and around the carport. Entering the shed, [Petitioner] saw more switch plates, nails, screws, screwdrivers and other items strewn on the shelves and in the dirt. Believing that these were the items that he had been given permission to take, [Petitioner] put some of these items in his pocket.

Heading out the rear door of the shed, [Petitioner] saw a pile of medicine cabinets. Believing that he had permission to take one, [Petitioner] selected a medicine cabinet and tried to carry it through a partially boarded up door, but it did not fit. He was trying to remove a board from the doorway to get the medicine cabinet out when he heard a car pull up.

[Petitioner] panicked and hid when he saw the sheriff's car, as he had an outstanding warrant. Once he was found by the deputies, [Petitioner] gave them a false name and did not tell them that he lived nearby because he did not want to be arrested for the outstanding warrant. He instead told the deputies that he became tired as he was walking home and entered the garage to find a place to sleep. [Petitioner] eventually told the deputies that he knew Steve and Jerry Countz and that they had given him permission to take some items from the property.

Prosecutorial Rebuttal

1

2

> Count[z] may have mistakenly told [Petitioner] that the light he had permission to take was in the garage rather than the carport.

3

4

5

> When Deputy Robles asked [Petitioner] whether he had permission to enter the garage or take anything from it, [Petitioner] replied that he did not. Robles opined that if [Petitioner] testified to the contrary he was lying. Robles did recall [Petitioner] stating that he knew the previous renter, but testified that [Petitioner] never told Robles that he knew Steve and Jerry Countz or that he had permission to be there.

6

(Opinion, at 2-6.)

7

DISCUSSION

8

A.    Jurisdiction

9

10

Relief by way of a petition for writ of habeas corpus extends to a person in custody pursuant to the judgment of a state court if the custody is in violation of the Constitution or laws or treaties of the United States.  28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); Williams v. Taylor, 529 U.S. 362, 375, 120 S.Ct. 1495, 1504, n.7 (2000).  Petitioner asserts that he suffered violations of his rights as guaranteed by the U.S. Constitution.  The challenged conviction arises out of the Mariposa County Superior Court, which is located within the jurisdiction of this Court. 28 U.S.C. § 2254(a); 2241(d).

11

12

13

14

15

16

On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its enactment.  Lindh v. Murphy, 521 U.S. 320, 117 S.Ct. 2059, 2063 (1997), cert. denied, 522 U.S. 1008, 118 S.Ct. 586 (1997); Jeffries v. Wood, 114 F.3d 1484, 1499 (9th Cir. 1997) (quoting Drinkard v. Johnson, 97 F.3d 751, 769 (5th Cir.1996), cert. denied, 520 U.S. 1107, 117 S.Ct. 1114 (1997), overruled on other grounds by Lindh v. Murphy, 521 U.S. 320, 117 S.Ct. 2059 (1997) (holding AEDPA only applicable to cases filed after statute's enactment).  The instant petition was filed after the enactment of the AEDPA and is therefore governed by its provisions.

17

18

19

20

21

22

23

24

B.    Standard of Review

25

This Court may entertain a petition for writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).

26

27

28

The AEDPA altered the standard of review that a federal habeas court must apply with respect to a state prisoner's claim that was adjudicated on the merits in state court. Williams v. Taylor, 120 S.Ct. 1495, 1518-23 (2000).  Under the AEDPA, an application for habeas corpus will not be granted unless the adjudication of the claim "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States;" or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State Court proceeding." 28 U.S.C. § 2254(d); Lockyer v. Andrade,123 S.Ct.1166 (2003) (disapproving of the Ninth Circuit's approach in Van Tran v. Lindsey, 212 F.3d 1143 (9th Cir. 2000)); Williams v. Taylor, 120 S.Ct. 1495, 1523 (2000).  "A federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." Lockyer, at 1175 (citations omitted).  "Rather, that application must be objectively unreasonable." Id. (citations omitted).

While habeas corpus relief is an important instrument to assure that individuals are constitutionally protected, Barefoot v. Estelle, 463 U.S. 880, 887, 103 S.Ct. 3383, 3391-3392 (1983); Harris v. Nelson, 394 U.S. 286, 290, 89 S.Ct. 1082, 1086 (1969), direct review of a criminal conviction is the primary method for a petitioner to challenge that conviction. Brecht v. Abrahamson, 507 U.S. 619, 633, 113 S.Ct. 1710, 1719 (1993).  In addition, the state court's factual determinations must be presumed correct, and the federal court must accept all factual findings made by the state court unless the petitioner can rebut "the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1); Purkett v. Elem, 514 U.S. 765, 115 S.Ct. 1769 (1995); Thompson v. Keohane, 516 U.S. 99, 116 S.Ct. 457 (1995); Langford v. Day, 110 F.3d 1380, 1388 (9th Cir. 1997).

C.     Prosecutorial Misconduct

Petitioner contends that the prosecutor engaged in misconduct by (a) violating a court order limiting characterization of Countz' misdemeanor prior conviction; (b) requesting witness comment on the veracity of other witnesses; and (c) eliciting Deputy Robles to comment on the veracity of the Petitioner.

1    A petitioner is entitled to habeas corpus relief if the prosecutor's misconduct "so infected

2   the trial with unfairness as to make the resulting conviction a denial of due process." Donnelly v.

3   DeChristoforo, 416 U.S. 637, 643, 94 S.Ct. 1868, 1871 (1974).   To constitute a due process

4   violation, the prosecutorial misconduct must be "of sufficient significance to result in the denial

5   of the defendant's right to a fair trial." Greer v. Miller, 485 U.S. 756, 765, 107 S.Ct. 3102, 3109

6   (1987), quoting United States v. Bagley, 473 U.S. 667, 105 S.Ct. 3375, (1985).  Under this

7   standard, a petitioner must show that there is a reasonable probability that the error complained

8   of affected the outcome of the trial - i.e., that absent the alleged impropriety, the verdict probably

9   would have been different.

10    Any claim of prosecutorial misconduct must be reviewed within the context of the entire

11   trial.  Id. at 765-66, 107 S.Ct. at 3109; United States v. Weitzenhoff, 35 F.3d 1275, 1291 (9th Cir.

12   1994).  The court must keep in mind that "[t]he touchstone of due process analysis in cases of

13   alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor"

14   and "the aim of due process is not punishment of society for the misdeeds of the prosecutor but

15   avoidance of an unfair trial to the accused." Smith v. Phillips, 455 U.S. 209, 219, 102 S.Ct. 940,

16   979 (1982).

17    1.    Violation of Court Order Limiting Impeachment of Jerry Countz

18    Petitioner contends that the prosecutor engaged in misconduct when she violated the trial

19   court's order limiting the prosecutor's characterization of Jerry Countz's misdemeanor prior

20   conviction for impeachment purposes.

21    Defense witness, Jerry Countz was previously convicted of two counts of misdemeanor

22   indecent exposure. (Cal. Pen. Code § 314, subd. 1.)   Prior to his testimony, the Court heard

23   argument by counsel regarding the use of his prior misdemeanor convictions for impeachment

24   purposes.  (RT 309.)  The Court ultimately ruled that one of Jerry Countz's prior convictions for

25   indecent exposure (Cal. Penal Code § 314), would be admitted as a "misdemeanor involving

26   moral[] turpitude."  (RT 308.)  The following discussion immediately ensued:

27        [THE COURT]: Now as long as we're addressing that, we also realize
      with regard to Mr. Bishop's prior, it's going to be limited to prior felony against a
28     person.  You recall that?

7

[DEFENSE COUNSEL]: Yes.

[THE COURT]: So it's a little more expanded than just a prior felony.  It's going to be expanded to include a crime against a person.

[DEFENSE COUNSEL]: And should he testify are we going to handle that with a stipulation at the time he's called?

[THE COURT]: I would think so - -

[DEFENSE COUNSEL]: Offer stipulation.

[PROSECUTOR]: Shouldn't I be able to ask him weren't you previously convicted?  I think the stipulation thing further limits me.  I think I ought to be able to say were you not convicted of a crime against a person involving moral turpitude?

[THE COURT]: I have no problem with her asking or your asking.  Actually, I think more appropriate to ask by counsel than stipulated to.

(RT 308.)

During cross-examination of Jerry by the prosecution, the following occurred:

[PROSECUTOR]: Now, you have sustained a misdemeanor conviction for a crime against a person that involves moral turpitude, have you not, in 19 - -

[DEFENSE COUNSEL]: Objection.

[THE COURT]: It miss characterizes the objection.  It's misdemeanor involving moral turpitude.  The court made that ruling.

[PROSECUTOR]: Oh, okay.  I thought you added that part.  A misdemeanor - -

[DEFENSE COUNSEL]: I'd ask for a jury - -

[THE COURT]: Ladies and Gentlemen, out of your presence and because of technical matters that the court has to rule on, outside the presence of the jury, in the case of Mr. Countz, the court has ruled that he has suffered a misdemeanor conviction involving moral turpitude.  And realize that you will be instructed later and I'll tell you at this time you may consider that fact as it affects his credibility, but you'll have more elaborate instruction when I finally instruction [sic] you in this case when all the evidence is in.

So, the fact that he has suffered a misdemeanor conviction involving moral turpitude, you can consider when I say as to his credibility whether or not you choose to believe his testimony or not.  And there are other factors to be considered in weighing his credibility.

All right, with that understanding go ahead with your question.

[PROSECUTOR]: I'll ask it again, sir.  Did you sustain a conviction in 1998 for a misdemeanor involving moral turpitude?

[MR. COUNTZ]: Yes, ma'am.  I made a mistake.

(RT 335-336.)

During deliberations, the jury sent out a question which the court summarized as "what is moral[] turpitude in relation to the law."  (RT 542, 546.)  After discussion by the court and counsel, it was determined that the prosecutor's question to Countz had been based on a mistaken understanding in light of the discussion as to how Petitioner's prior would be admitted.  (RT 395, 542-545.)  Defense counsel represented his belief that the prosecutor had merely made a "good faith error," and he asked that the jurors be told they should "simply [] forget about the

8

moral [] turpitude part" and that "he's got a misdemeanor conviction and you can consider that in weighing its credibility." (RT 542-545.) The prosecutor ultimately concluded that it was "not that big of a deal." (RT 545.) The court instructed the jurors as follows:

> Another question is what is moral[] turpitude in relation to the law. And let me tell you that you should not get distracted by what is morale turpitude. I have made a ruling that what Mr. Countz was previously convicted of, that that conduct amounted to moral[] turpitude within the meaning of the law which allows you to consider that misdemeanor conviction as far as his credibility is concerned.
>
> So you don't need an explanation of what is moral[] turpitude. You don't need to know what the facts were. I made a determination that you may consider it. And I will say this, it is a cut above a normal misdemeanor. When I say "normal misdemeanor" a lesser misdemeanor. It's a cut above. But obviously, it's not a felony, because it would be called a felony."
>
> So don't be distracted by the fact that a label of moral[] turpitude has been applied. The instruction says that you may consider that misdemeanor for purposes of determining the credibility of the witness. Okay. And if you really, really feel that its important, we will compile a definition for you.

(RT 546-547.)

In rejecting Petitioner's claim on direct appeal, the Court of Appeal held as follows:

> Assuming, without deciding, that the prosecutor's use of the words "against a person" regarding Jerry's misdemeanor was misconduct, we find no prejudice to have accrued to [Petitioner's] case from these words. [Petitioner] fails to explain how the prosecutor's words may have caused prejudice toward his case. The trial court instructed the jury in the manner suggested by defense counsel. Any error beyond that objected to was waived for purposes of appeal. Unlike [Petitioner], we do not read the jury's attention toward the term "moral turpitude" to indicate anything beyond confusion about the meaning of this legal term.

(Opinion, at 10.)

As noted by Petitioner's defense counsel at trial, it appears that the prosecutor's comment was nothing more than a good faith error in relation to the parties prior stipulation. (RT 395, 542-545.) The mistake was immediately cured by the trial court's admonition to the jury and defense counsel was satisfied with the result. Petitioner's contention in his supplemental traverse that the prosecutor deliberately disregarded the trial court's order is speculative and conclusory. It was therefore objectively reasonable for the Court of Appeal to conclude there was nothing reprehensible or deceptive in the prosecutor's comment thereby supporting the finding that there was no prosecutorial misconduct.

In any event, the Court of Appeal's conclusion that there was no prejudice demonstrated

by the mere fact that the jurors later asked the question regarding the meaning of "moral turpitude," is not contrary to or an unreasonable application of clearly established Supreme Court precedent.  As Respondent argues, it was rational for the Court of Appeal to infer the jurors' focus on the meaning of the term "moral turpitude" was the result of ignorance of the meaning of that phrase.  Petitioner's contention in his supplemental traverse that the prosecutor's mentioning of the crime against a person was intended to diminish Mr. Countz's testimony as the jury was clearly focusing on the term "moral turpitude" fails to demonstrate that he was prejudiced by counsel's actions.  To the contrary, the record discloses otherwise.  It was rational to infer the jurors still would have been ignorant of the term – and hence they still would have asked the question – even in the absence of the prosecutor's misstatement, because even in the absence of the misstatement the meaning of that phrase was unknown to the jurors.

    2.    Requesting Witness Comment on Veracity of Other Witness

    Petitioner contends that the prosecutor attacked the credibility of Petitioner and other defense witnesses by repeatedly asking them to comment upon the credibility of the witnesses against Petitioner.

    "A prosecutor's improper questioning is not in and of itself sufficient to warrant reversal."  United States v. Geston, 299 F.3d 1130, 1136 (9th Cir. 2002) (citing Ortiz v. Stewart, 149 F.3d 923, 934 (9th Cir. 1998).  "It must also be determined whether the prosecutor's actions 'seriously affected the fairness, integrity, or public reputation of judicial proceedings, or where failing to reverse a conviction would result in a miscarriage of justice.'" Id. (citing United States v. Tanh Huu Lam, 251 F.3d 852, 862 (9th Cir. 2001).

    The alleged improper questioning, as set forth in the petition, is as follows:

    On cross-examination of Jerry Countz, the prosecutor asked:

    Q.    If Tina Peacock, the defendant's girlfriend, said she was present when you told him he could have the vanity or medicine cabinet, would that be the truth or a lie?
    A.    I don't remember it.  I don't remember the vanity thing you're talking about, medicine chest, so I don't know if it would be a truth or a lie because I don't remember it.

(RT 343.)

    On cross-examination of Tina Peacock, the prosecutor asked:

Q.    And when did Steve give you permission to take light switches and light covers, Steve Countz?

A.    A couple times.  Once at the tavern and then while we were cleaning up the place.

Q.    If his testimony hypothetically speaking under oath was that he did not give you permission to take light switches and light covers, would he be lying?

A.    I don't know.

(RT 368.)

It was later asked:

Q.    Do you recall telling Officer Robles that you were concerned because you were buying a house and now you had to move because of the penalty Ronald was facing?

A.    Not because of the penalty Ronald was facing.  His brother was supposed to be making house payments and he quit.

Q.    So if Officer Robles wrote that you told him that you were upset because you were buying a house and now you have to move because of the penalty Ronald was facing, that would have been an inaccurate statement?

A.    Yes.

(RT 369.)

In cross-examination of Petitioner, the prosecutor asked the following:

Q.    Now you heard the testimony of Steve Countz; correct?

A.    Countz, yes.

Q.    Countz.  You know he testified - - was he incorrect when he testified that he never gave you permission to take switches or any other electrical things?

A.    What do you mean?

Q.    Well, you heard his testimony that he didn't give you permission to take electrical items.  Did you hear that?

A.    He said there was a shop light and a box of stuff in the shed, not the shed but carport.

Q.    He said the shop light, that he said he didn't give you permission to take; did you hear that?

A.    I must have heard it but I didn't - -

(RT 399-400.)

Later the prosecutor asked:

Q.    Now, it's your testimony that you believe that you had a right to go in, into the garage and take whatever vanity or medicine cabinet that pleased you?

A.    Yes.  That's what Jerry said.  He said there was a couple of them in there, take your pick.

Q.    Well, you heard Jerry's testimony today; didn't you?

A.    Yes, I did.

Q.    And that he didn't recall telling you that?

A.    He said he didn't recall.  He didn't say he didn't say [sic].  He said he doesn't recall.  He said he might have said something about it and but he didn't recall.  Me and Tina were both there, and you heard Tina, yes, she recalls, drinking coffee while I was showing him everything I wanted everywhere, where I wanted all the lights to go.  And when I showed him one light above the bathroom sink, he told me there were a couple medicine cabinets over there and I could pick one out.

11

1  (RT 401-402.)

2      The prosecutor subsequently asked Petitioner:

3      Q.      And then the officer asked you if you had permission to enter the garage and take
               any items from it; didn't he?
4      A.      Yeah, I believe he did.
       Q.      And you told him that you did not; didn't you?
5      A.      No, I told him I did.  At first I told him I didn't have permission to be in there
               when he asked me if I had permission to be in there sleeping and I told him no.
6      Q.      If the deputy wrote in his report and testified on the stand under oath that you told
               him no, you did not have permission to enter the garage or take any items from it,
7              he would be lying?
       A.      No, he just - - I wouldn't say he's lying, just got his story backwards.
8      Q.      Well, if Officer McCann testified that he heard you say no - -
       A.      He testified - -
9      Q.      - - you didn't have permission to enter the garage and no, you didn't have
               permission to take any items, would Officer McCann be lying, too?
10     A.      Officer McCann testified that he didn't hear exactly what all was said.  I was
               sitting there listening to him, too.  He was doing something else from what he
11             said.  And like I said, I told him, no, I didn't have permission to be in the garage
               to sleep.  When I came through and I told him what I was doing there, that I knew
12             Steve and them and he gave me these parts, I told them, yes, I did have permission
               to take them, all these little bitty parts, screwdriver, the pliers, those hacksaw
13             blades.  No, I didn't have permission to take them.  But I figured they're in the
               dirt, just going to be throwed [sic] out.  As far as I was concerned, looking at the
14             place it's all trash.  So I figured I'd grab them.
       Q.      I'm curious, Mr. Bishop.  If you're willing, as you told us, to lie to avoid arrest on
15             the warrant, are you willing to avoid charges or convictions on charges to lie
               under oath?
16     A.      No.

17  (RT 406-407.)

18     Later, the prosecutor asked:

19     Q.      Now after you were arrested you were taken towards the vehicle by Deputy
               McCann; correct?
20     A.      Yes.
       Q.      What did you do then?
21     A.      I walked with him to the vehicle and he gave me the rights again.
       Q.      Then what you [sic] did you?
22     A.      I stood there.  He opened up the front door and he reached in, hit the button and he
               hit the back door for me and I turned and ran and he was shining the light for the
23             other officer and that's when I took off.
       Q.      So you didn't pull away from his arm like he said?
24     A.      No, I did not.  He did not have a hold of me.  He opened the door for me.  How
               can he be standing on one side of the door and be holding my arm while he's
25             wanting me to get in?
       Q.      So if he's testified he was holding your arm and you turned toward him and pulled
26             away, he would have been lying?
       A.      Yes, he was mistaken.
27
    (RT 413-414.)
28

In rejecting Petitioner's claim on direct appeal, the Court of Appeal concluded:

> [O]nly Deputy Robles actually directly responded to the prosecutor's request for an opinion on another's truthfulness in particular testimony. The other witnesses responded that there might have been a failure by one party or another to recollect conversations that would explain their divergent accounts. Such responses were proper, were not prejudicial to [Petitioner's] case, and thus are not relevant to our analysis of the alleged error.

(Opinion, at 7.)

In this instance, there was no prosecutorial misconduct by questioning the witnesses in the form done by the prosecutor. Even if error, in light of the entire record, the responses given by the witnesses and the overwhelming evidence of Petitioner's guilt, the Court finds that Petitioner was not deprived of a fair trial and there was therefore no due process violation.

As the Court of Appeal reasonably found, only Deputy Robles actually directly responded to the prosecutor's request to opine about another witnesses veracity. As Respondent submits, the prosecutor's attempt to elicit opinions on veracity failed. As such, it simply cannot be said that the prosecutor's actions seriously affected the fairness, integrity, or public reputation of judicial proceedings, or would result in a miscarriage of justice.

With regard to witness Jerry Countz, he stated that he did not remember whether he told Petitioner he could take the vanity or medicine chest and therefore could not determine whether Petitioner's girlfriend, Tina Peacock, was telling the truth or lying.

With regard to witness Tina Peacock, she stated that she did not know whether Steve Countz would be lying if he testified that he never gave her permission to take the light covers and switches.

With regard to Petitioner, Petitioner did not comment on the veracity of Steve Countz and Petitioner attempted to clarify that Jerry Countz did not remember whether he told Petitioner he could take the vanity and medicine cabinet.

As phrased by defense counsel during closing argument, the issue in this case boiled down to whether Petitioner had the specific intent to steal the property when he entered the shed, thus constituting burglary, or whether he formed the intent to steal after he entered the shed, constituting theft. (RT 487-488.)  There were differing versions as to the scope of consent

1   Petitioner was given to take certain items and whether he had a good faith belief in that consent.

2   Based on the jury's finding of guilt, it necessarily rejected Petitioner's version of the transpired

3   events. Thus, the questions regarding the differing accounts of the testimony were based on the

4   evidence already in the record and were not the personal views of the prosecutor. Further, the

5   questions went to the ultimate issue in this case-credibility and to whose version of the events the

6   jury was going to believe. As stated by the prosecutor in closing argument, someone was lying

7   either the officers or Petitioner. (RT 529.) As Respondent submits, the prosecution merely

8   pointed out the discrepancies in the testimony that was or would be apparently obvious to the

9   jury.

10      Moreover, sufficient evidence supports the jury's finding of guilt. Police were called to

11   respond to a call in which a neighbor heard what sounded like someone prying a board open.

12   (RT 190-191.) When police arrived to the residence and searched the shed, they discovered

13   Petitioner hiding with his sweater over his head in the back of the shed. (RT 267.) While

14   conducting a pat-down of Petitioner, officers discovered various electrical items including switch

15   plates, screwdrivers, necklace, razor knife, hacksaw blade, and other electrical items. (RT 200,

16   269.) Petitioner had tools on him and both officers testified that Petitioner stated he did not

17   have permission to take all the items nor did he have permission to be in the shed. (RT 202, 274,

18   282.) Petitioner told Deputy Robles that he was sawing on a nail because he wanted to get to the

19   vanity that was in the garage. (RT 276.)

20      Steve Countz, the prior lease owner of the property testified that his son Jerry Countz

21   lived with Petitioner and his girlfriend, Tina Peacock. (RT 210.) Because Countz's lease was

22   terminating and he was moving out of the property, he employed Tina Peacock to clean the

23   windows at his house. In return for her services, Countz told Tina she could have the chickens

24   living in the coop, the chicken feed, a fluorescent shop light fixture that was installed in the

25   carport, and a pool table that he left behind the garage. (RT 213-216.)

26      Steve Countz unequivocally testified that he never gave anyone permission to take the

27   vanity, necklace, screwdrivers, or electrical switches. (RT 220.) Ruth Helzer the owner of the

28   property, testified that the vanity/medicine cabinet on the property belonged to her and she never

gave permission to anyone to take it.  (RT 242.)  Further, pursuant to the lease agreement

between herself and Steve Countz, Countz was not to have possession of the garage.  (RT 239.)

Jerry Countz testified that he never gave permission to Petitioner to take anything from

the garage.  (RT 337.)  Jerry did tell Petitioner he could have a light, some switches, and a box of

electrical stuff in the shop.  (RT 328-329, 338.)

Petitioner himself admitted that he did not have permission to take all of the items taken.

(RT 407.)  Petitioner testified that Jerry Countz told him that there were two or three medicine

cabinets at his father's residence he could have.  (RT 388.)  However, Jerry testified that he did

not remember whether he told Petitioner about a medicine cabinet.  (RT 343.)  Tina, however,

testified that she recalled hearing the conversation when Jerry told Petitioner he could take the

medicine cabinet.  (RT 367-368.)  Petitioner further admitted that he hid from police and

attempted to escape after he was placed under arrest and in handcuffs.  (RT 408, 413-414.)

Further, the jury was instructed that they were the sole judges of the believability of a

witness and the weight to be given the testimony of each witness.  (RT 442.)  The jury was also

instructed that "[d]iscrepancies in a witness' testimony or between a witness' testimony and that

of other witnesses, if there were any, do not necessarily meaning [sic] that a witness should be

discredited. . . . Two persons witnessing an incident or transaction often will see or hear it

differently. . . ."  (RT 443.)  The prosecution reenforced to the jury in closing argument that they

were the sole judges of the weight to give to the witnesses testimony.  (RT 531.)  Based on the

foregoing, there was no prosecutorial misconduct.

3.     Eliciting Deputy Robles's Comments on the Veracity of Petitioner

Petitioner contends that the prosecutor engaged in misconduct by electing testimony from

Deputy Robles regarding the veracity of Petitioner.

The challenged questioning is as follows:

> Q.    Deputy Robles, relative to your questioning of the [Petitioner] about what he was
>        doing in the garage did you or did you not specifically ask him whether he had
>        permission to enter the garage or to take any items from it?
> A.    I did.
> Q.    What was his response?
> A.    No.
> Q.    So if he testified under oath that he told you he did, in your opinion is he lying?

A.      Yes.

(RT 422.)

In rejecting Petitioner's claim on direct appeal, the Court of Appeal held:

> As noted by Respondent, among those similarly questioned, only Deputy Robles actually directly responded to the prosecutor's request for an opinion on another's truthfulness in particular testimony.  The other witnesses responded that there might have been a failure by one party or another to recollect conversations that would explain their divergent accounts.  Such responses were proper, were not prejudicial to [Petitioner's] case, and thus are not relevant to our analysis of the alleged error.
> The context of Robles's disputed testimony indicates that it was not likely to have greatly impacted the jury's evaluation of that testimony of [Petitioner's] tendencies toward veracity generally. [Petitioner] admitted that he lied to the deputies in the first place, telling them a false identity so they would not find out that there was a warrant pending for his arrest.  The jury had already been informed that beyond this outstanding warrant, [Petitioner] had a prior conviction for a felony involving moral turpitude. [Petitioner] also admitted that he attempted to flee from the officers after he was arrested, indicating a propensity to dishonestly evade prosecution.  The jury therefore had ample grounds to doubt [Petitioner's] veracity outside of Robles's opinion.
> [¶] Robles had testified as to the specifics of the conversation between himself, Deputy McCann and [Petitioner].  Robles's account, that [Petitioner] had not claimed to have permission to be on the property, was before the jury in obvious contrast to [Petitioner's] account that he had told the deputies that he did have permission to be where he was.  Robles's conclusion was thus not a great expansion beyond the evidence already properly before the jury.
> The jury was instructed that they were the judges of the credibility of witnesses and facts of the case.  They were also instructed that differing accounts of facts between witnesses are frequently the product of differing perception or failure of recollection.  Further, they were permitted to use [Petitioner's] admitted lies as evidence of consciousness of his guilt of the charged crime.

(Opinion, at 7-8.)

For the reasons explained by the Court of Appeal there was no resulting prejudice and Petitioner was not denied a fair trial.  The state courts' determination of this issue was not contrary to, or an unreasonable application of, clearly established Supreme Court precedent. Accordingly, Petitioner is not entitled to relief.

D.      Ineffective Assistance of Counsel

Petitioner contends that defense counsel was ineffective for (a) failing to object to improper questions by prosecutor; and (b) failing to raise a hearsay objection to evidence of Countz's misdemeanor conviction.

The law governing ineffective assistance of counsel claims is clearly established for the

purposes of the AEDPA deference standard set forth in 28 U.S.C. § 2254(d).  Canales v. Roe,

151 F.3d 1226, 1229 (9th Cir. 1998.)  In a petition for writ of habeas corpus alleging ineffective

assistance of counsel, the court must consider two factors.  Strickland v. Washington, 466 U.S.

668, 687, 104 S.Ct. 2052, 2064 (1984); Lowry v. Lewis, 21 F.3d 344, 346 (9th Cir. 1994).  First,

the petitioner must show that counsel's performance was deficient, requiring a showing that

counsel made errors so serious that he or she was not functioning as the "counsel" guaranteed by

the Sixth Amendment.  Strickland, 466 U.S. at 687.  The petitioner must show that counsel's

representation fell below an objective standard of reasonableness, and must identify counsel's

alleged acts or omissions that were not the result of reasonable professional judgment

considering the circumstances.  Id. at 688; United States v. Quintero-Barraza, 78 F.3d 1344, 1348

(9th Cir. 1995).  Judicial scrutiny of counsel's performance is highly deferential.  A court indulges

a strong presumption that counsel's conduct falls within the wide range of reasonable

professional assistance.  Strickland, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064 (1984); Sanders v.

Ratelle, 21 F.3d 1446, 1456 (9th Cir.1994).

Second, the petitioner must demonstrate that "there is a reasonable probability that, but

for counsel's unprofessional errors, the result ... would have been different," 466 U.S., at 694.

Petitioner must show that counsel's errors were so egregious as to deprive defendant of a fair

trial, one whose result is reliable.  Strickland, 466 U.S. at 688.  The court must evaluate whether

the entire trial was fundamentally unfair or unreliable because of counsel's ineffectiveness.  Id.;

Quintero-Barraza, 78 F.3d at 1345; United States v. Palomba, 31 F.3d 1356, 1461 (9th Cir. 1994).

A court need not determine whether counsel's performance was deficient before

examining the prejudice suffered by the petitioner as a result of the alleged deficiencies.

Strickland, 466 U.S. 668, 697, 104 S.Ct. 2052, 2074 (1984).  Since the defendant must

affirmatively prove prejudice, any deficiency that does not result in prejudice must necessarily

fail. However, there are certain instances which are legally presumed to result in prejudice, e.g.,

where there has been an actual or constructive denial of the assistance of counsel or where the

State has interfered with counsel's assistance.  See Strickland, 466 U.S. at 692; United States v.

Cronic, 466 U.S., at 659, and n. 25, 104 S.Ct., at 2046-2047, and n. 25 (1984).

1    Ineffective assistance of counsel claims are analyzed under the "unreasonable

2    application" prong of Williams v. Taylor, 529 U.S. 362 (2000).  Weighall v. Middle, 215 F.3d

3    1058, 1062 (2000).  With this standard in mind, the Court now turns to each of Petitioner's

4    claims of ineffective assistance of counsel.

5         1.    Failing to Object to Improper Questions by Prosecutor

6         Petitioner contends that defense counsel was ineffective for failing to object to

7    prosecution's attempt to get defense witnesses to testify as to the veracity of other witnesses.

8         As set forth by Respondent in its answer, the Court of Appeal's decision that counsel was

9    not incompetent for failing to object to the prosecutor's questioning of several witnesses, was

10   objectively reasonable.

11        Petitioner submits several instances of misconduct by counsel's failure to object to certain

12   questioning, the Court will examine each instance in turn.[4]

13        On cross-examination of Jerry Countz, the prosecutor asked:

14        Q.    If Tina Peacock, the defendant's girlfriend, said she was present when you told
              him he could have the vanity or medicine cabinet, would that be the truth or a lie?
15        A.    I don't remember it.  I don't remember the vanity thing you're talking about,
              medicine chest, so I don't know if it would be a truth or a lie because I don't
16            remember it.

17   (RT 343.); and

18        Q.    If his [Steve Countz's] testimony hypothetically speaking under oath was
19            that he did not give you permission to take light switches and light covers,
              would he be lying?
20        A.    I don't know.

21   (RT 368.)

22        As Respondent submits, it was objectively reasonable for the Court of Appeal to find that

23   a reasonable defense attorney could have let stand the above colloquies.  The above colloquies

24   reflect failures in cross-examination.  When cross-examining Jerry Countz, the prosecutor tried,

25   but failed, to have him refute favorable extrajudicial evidence by Peacock.  (RT 286.)  When

26   cross-examining Peacock, the prosecutor again tried, but failed, to have Peacock possibly

27

28        _____
          [4] These instances are set forth under section C.

18

impeach herself by testifying in contradiction to Steve Countz.  Because the prosecutor's

attempts to elicit opinions on veracity failed; it was objectively reasonable for the state court to

find such failures justified defense counsel's election not to bother with objections

(or motions to strike).  Thus, the state court reasonably could find there was no deficiency in

counsel's lack of objection to the above testimony.

It was also reasonable for the state court to find defense counsel was not compelled to

object to the following colloquy.

> Q.  Do you recall telling Officer Robles that you were concerned because you were
> buying a house and now you had to move because of the penalty Ronald was
> facing?
> A.  Not because of the penalty Ronald was facing.  His brother was supposed to be
> making house payments and he quit.
> Q.  So if Officer Robles wrote that you told him that you were upset because you were
> buying a house and now you have to move because of the penalty Ronald was
> facing, that would have been an inaccurate statement?
> A.  Yes.

(RT 369.)

As Respondent submits it was reasonable for the state court to conclude that there was

nothing objectionable about such testimony.  The prosecutor simply elicited that Peacock

believed in a different version of facts than were reflected in Deputy Robles's report - a point

which would have been obvious to the jurors in any event.  Although the testimony strongly

indicated that Peacock questioned the accuracy of any such hypothetical report, the testimony did

not state an opinion as to the veracity of the person who authored the report.  When a witness has

testified to one version of the facts, a question whether a differing version of the facts can be

considered accurate has a tendency in reason to establish the "existence or nonexistence" of the

facts testified to by the witness (Cal. Evid. Code § 780(I)).  Such a question does not require the

witness to state an opinion as to the mental state of the person who offered the differing version.

The answer itself was permissible, which justified the absence of a motion to strike.

With regard to the questioning of Petitioner, it was further objectively reasonable for the

state court to reject the argument that trial counsel was compelled to objecting during the

prosecution's cross-examination of Petitioner:

In cross-examination of Petitioner, the prosecutor asked the following:

Q.  Now you heard the testimony of Steve Countz; correct?
A.  Countz, yes.
Q.  Countz.  You know he testified - - was he incorrect when he testified that he never gave you permission to take switches or any other electrical things?
A.  What do you mean?
Q.  Well, you heard his testimony that he didn't give you permission to take electrical items.  Did you hear that?
A.  He said there was a shop light and a box of stuff in the shed, not the shed but carport.
Q.  He said the shop light, that he said he didn't give you permission to take; did you hear that?
A.  I must have heard it but I didn't - -

(RT 399-400.)

It was objectively reasonable for the Court of Appeal to find nothing objectionable in this exchange.  The prosecutor sought to elicit whether Petitioner agreed with Steve Countz's factual account.  The prosecutor did not ask Petitioner if Steve Countz would be lying - rather than mistaken - if Petitioner in fact disagreed with Steve Countz's version of the facts.  Because he was present at trial, Petitioner had heard Steve Countz's testimony.  Petitioner was thus a firsthand witness and was competent to testify to whether he believed that testimony was accurate.  It was therefore reasonable for the state court to find no deficiency of counsel.

Later the prosecutor asked:

Q.  Now, it's your testimony that you believe that you had a right to go in, into the garage and take whatever vanity or medicine cabinet that pleased you?
A.  Yes.  That's what Jerry said.  He said there was a couple of them in there, take your pick.
Q.  Well, you heard Jerry's testimony today; didn't you?
A.  Yes, I did.
Q.  And that he didn't recall telling you that?
A.  He said he didn't recall.  He didn't say he didn't say [sic].  He said he doesn't recall.  He said he might have said something about it and but he didn't recall. Me and Tina were both there, and you heard Tina, yes, she recalls, drinking coffee while I was showing him everything I wanted everywhere, where I wanted all the lights to go.  And when I showed him one light above the bathroom sink, he told me there were a couple medicine cabinets over there and I could pick one out.

(RT 401-402.)

In this vein, it was objectively reasonable for the Court of Appeal to find that there was a rational reason for counsel not to object.  During this cross-examination, Petitioner took advantage of the opportunity to launch into a narrative which the prosecutor failed to cut-off.  As

1   Respondent submits, defense counsel may have observed that Petitioner was quite capable of

2   ensuring that the most favorable version of his testimony was set forth without the need for

3   counsel to interpose an objection - if one was warranted.  Further, the prosecution merely asked

4   Petitioner if he had heard Jerry's testimony and there was elicitation as to the veracity of that

5   witness.   Thus, the state court's determination that counsel was not incompetent for failing to

6   object was reasonable.

7          The prosecutor subsequently asked Petitioner:

8          Q.    And then the officer asked you if you had permission to enter the garage and take
                 any items from it; didn't he?
9          A.    Yeah, I believe he did.
           Q.    And you told him that you did not; didn't you?
10         A.    No, I told him I did.  At first I told him I didn't have permission to be in there
                 when he asked me if I had permission to be in there sleeping and I told him no.
11         Q.    If the deputy wrote in his report and testified on the stand under oath that you told
                 him no, you did not have permission to enter the garage or take any items from it,
12               he would be lying?
13         A.    No, he just - - I wouldn't say he's lying, just got his story backwards.
           Q.    Well, if Officer McCann testified that he heard you say no - -
           A.    He testified - -
14         Q.    - - you didn't have permission to enter the garage and no, you didn't have
                 permission to take any items, would Officer McCann be lying, too?
15         A.    Officer McCann testified that he didn't hear exactly what all was said.  I was
                 sitting there listening to him, too.  He was doing something else from what he
16               said.  And like I said, I told him, no, I didn't have permission to be in the garage
                 to sleep.  When I came through and I told him what I was doing there, that I knew
17               Steve and them and he gave me these parts, I told them, yes, I did have permission
                 to take them, all these little bitty parts, screwdriver, the pliers, those hacksaw
18               blades.  No, I didn't have permission to take them.  But I figured they're in the
                 dirt, just going to be throwed [sic] out.  As far as I was concerned, looking at the
19               place it's all trash.  So I figured I'd grab them.
           Q.    I'm curious, Mr. Bishop.  If you're willing, as you told us, to lie to avoid arrest on
20               the warrant, are you willing to avoid charges or convictions on charges to lie
                 under oath?
21         A.    No.

22   (RT 405-407.)

23         Although the prosecution's questioning may have been argumentative, it was objectively

24   reasonable for defense counsel not to object.  Petitioner refrained from rendering an opinion on

25   the deputies character for honesty and instead again launched into a narrative theory as to how

26   the officer's testimony correlated to his testimony.  Further, the prosecution's questioning merely

27   pointed out the discrepancies between Petitioner's and Officer McCann's testimony.

28         Later, the prosecutor asked:

| | | |
|---|---|---|
| Q. | Now after you were arrested you were taken towards the vehicle by Deputy McCann; correct? |
| A. | Yes. |
| Q. | What did you do then? |
| A. | I walked with him to the vehicle and he gave me the rights again. |
| Q. | Then what you [sic] did you? |
| A. | I stood there.  He opened up the front door and he reached in, hit the button and he hit the back door for me and I turned and ran and he was shining the light for the other officer and that's when I took off. |
| Q. | So you didn't pull away from his arm like he said? |
| A. | No, I did not.  He did not have a hold of me.  He opened the door for me.  How can he be standing on one side of the door and be holding my arm while he's wanting me to get in? |
| Q. | So if he's testified he was holding your arm and you turned toward him and pulled away, he would have been lying? |
| A. | Yes, he was mistaken. |

(RT 413-414.)

It was objectively reasonable for the Court of Appeal to find no incompetence on the part of defense counsel by failing to object.  The prosecutor merely pointed out the inconsistencies between Petitioner and Officer McCann's testimony.  Further, as Respondent submits, Petitioner's credibility was important.  One rational way to bolster that credibility in front of the jurors was to limit the interruptions by defense counsel, so that Petitioner could be presented as a reasonable layperson.  The Court of Appeal was not compelled to dismiss such an approach by defense counsel as incompetent; indeed, as the record shows, the prosecutor found it important to address Petitioner's responses to the cross-examination in rebuttal testimony by Deputy Robles.  Moreover, this was a collateral issue, as Petitioner conceded to the fleeing charge, which greatly diminishes any potential prejudice to Petitioner.

Finally, the following occurred during the prosecution's direct examination of Deputy Robles on rebuttal:

| | | |
|---|---|---|
| Q. | Deputy Robles, relative to your questioning of the [Petitioner] about what he was doing in the garage did you or did you not specifically ask him whether he had permission to enter the garage or to take any items from it? |
| A. | I did. |
| Q. | What was his response? |
| A. | No. |
| Q. | So if he testified under oath that he told you he did, in your opinion is he lying? |
| A. | Yes. |

(RT 422.)

As Respondent submits, under these circumstances defense counsel may have concluded

22

1  that the final question and answer was superfluous, i.e., if the jurors believed the prior two

2  questions and answers, the inference that Petitioner was guilty as charged was all but irresistible.

3  An objection, even if successful, would have gained nothing but preservation of form without

4  substance.  Further, it was rational for the state court not to focus on whether Deputy Robles's

5  opinion was, in the abstract, irrelevant or incompetent.  The above exchange provided further

6  opportunity to contrast, on the one hand, Petitioner's view that witnesses may disagree innocently

7  in their recollection and, on the other, the prosecutor's view that one or the other is lying. As

8  stated by the Court of Appeal, Robles's conclusion that Petitioner was lying was not a great

9  expansion beyond the evidence already properly before the jury.  Therefore, it was objectively

10  reasonable for the Court of Appeal to find that Petitioner failed to demonstrate that trial counsel

11  was compelled constitutionally to object to the testimony elicited above.

12       Moreover, it was objectively reasonable for the Court of Appeal to conclude that

13  Petitioner failed to demonstrate any resulting prejudice.  As stated by the Court of Appeal, there

14  was ample evidence before the jury, independent of Deputy Robles's testimony, questioning the

15  veracity of Petitioner's testimony.  As such, it simply cannot be said that Petitioner was

16  prejudiced by counsel's failure to object.

17       In sum, the real complaint or objection is that the prosecutor's questioning was

18  argumentative, i.e. that the prosecutor is already suggesting what inference the jurors should

19  draw from the conflicts in the evidence.  There is nothing fundamentally unfair to a defendant if

20  the jurors are made aware during questioning of the prosecutor's view of what inference the trial

21  evidence should lead to.  As Respondent submits, there could be no objection if, after the close of

22  the evidence, a prosecutor during argument contrasted witnesses' differing factual versions and

23  argued, based on such differences, the inference that some witnesses were liars.  And, the jurors

24  would surely be free to draw such an inference whether or not either attorney argued it.  Based on

25  the foregoing, it was objectively reasonable for the state court to find no relief on Petitioner's

26  ineffective assistance of counsel claim.

27       2.    Failing to Raise Hearsay Objection to Countz Misdemeanor Conviction

28       Petitioner contends that defense counsel was incompetent for failing to raise a hearsay

23

1    exception to Countz misdemeanor conviction.

2            In rejecting Petitioner's claim on direct appeal, the Court of Appeal held:

3                    [R]egardless of whether the fact of conviction itself was admissible to
        prove that Jerry had behaved in a fashion that indicated moral turpitude, the court
4        had already ruled that evidence of his moral turpitude was relevant to his
        credibility. [Petitioner] does not dispute that Jerry's prior act of moral turpitude
5        was admissible against him.  Thus, had the prosecutor been barred from admitting
        the sanitized rendition of Jerry's conviction, the court may well have altered its
6        ruling to permit the prosecutor to question him regarding the specific acts he had
        committed so that this relevant evidence could be admitted in some form.  Thus, it
7        is plausible that defense counsel made a strategic decision to concede to the
        sanitized questioning permitted by the court rather than risk having the facts
8        underlying Jerry's conviction for indecent exposure paraded before the jury.
        Defense counsel's failure to object to hearsay evidence may have been the result
9        of a legitimate trial tactic.

10   (Opinion, at 10-11.)

11          As Respondent submits, a misdemeanor conviction is hearsay when offered to prove the

12   witness engaged in conduct which involved moral turpitude, i.e., it is hearsay evidence of facts

13   which tend to undermine the witness's character for honesty.  (See Cal. Penal Code § 780(e)(, §

14   1101(c), § 1200.)  Upon objection, such hearsay is excludable.  People v. Wheeler, 4 Cal.4th 284,

15   297 n. 7 (1992).

16          As stated by the Court of Appeal, a successful hearsay objection would not have

17   prevented the prosecution from proving that Jerry Countz engaged in conduct involving moral

18   turpitude.  To the contrary, a successful objection simply would have left the prosecution no

19   recourse but to actually elicit testimony as to exactly what conduct Jerry Countz had committed,

20   so that the jurors could have determined themselves whether such conduct reflected a sufficient

21   character trait to warrant disbelief in his testimony.  People v. Wheeler, 4 Cal.4th at 297, n. 7 (the

22   California Constitution "makes immoral conduct admissible for impeachment whether or not it

23   produced any conviction, felony or misdemeanor".)  Thus, as Respondent argues, such an

24   objection would only have eliminated the possibility that the prior misconduct would not have

25   been proven by sanitized hearsay - e.g., "a misdemeanor involving moral turpitude."  However,

26   this option would have opened the door for more damning methods of proof to come into play.

27          The state courts' determination of this issue was not contrary to, or an unreasonable

28   application of, clearly established Supreme Court precedent.  It was not objectively unreasonable

for the California Court of Appeal to imagine that a defense attorney rationally might seek to avoid such a spectacle, when the alternative is a bit of sanitized hearsay.  The Court of Appeal reasonably concluded that no prejudice resulted from the lack of objection, but rather that it was not reasonably probable that a better result would have obtained had the prosecution been forced to put before the jurors firsthand testimony of the distasteful details of the prior conduct by one of the defense's main witnesses.

ORDER

Based on the foregoing, it is HEREBY ORDERED that:

1.      The petition for writ of habeas corpus is DENIED; and

2.      The Clerk of Court shall enter judgment in favor of Respondent.


IT IS SO ORDERED.

**Dated:    October 19, 2005**                        **/s/ Dennis L. Beck**
3b142a                                      UNITED STATES MAGISTRATE JUDGE